IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82805-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| CHRISTOPHER MORISETTE, | UNPUBLISHED OPINION |
| Appellant. | |

COBURN, J. — Christopher Morisette stabbed three unrelated strangers in downtown Seattle. He then stripped off his clothes and ran. Soon after, he complied with police commands and submitted to his arrest. He was found competent to stand trial but disrupted jury selection and trial multiple times. The trial court denied defense counsel's request during trial for a second competency evaluation. Morisette appeals that decision and also argues that his counsel was deficient for not requesting a voluntary intoxication instruction. A jury convicted Morisette of one count of assault in the first degree and three counts of assault in the second degree. The State agrees with Morisette that insufficient evidence supports the conviction of Count 4. We reverse Count 4 and remand for resentencing but otherwise reject Morisette's other claims and affirm the convictions for Counts 1-3.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On July 9, 2019, Andrew Marquis passed by and later identified Christopher Morisette who was holding a four-inch knife in downtown Seattle. Morisette held the knife with the blade faced toward himself doing a "light like tapping motion, just kind of rhythmically. . . ." Around the same time, bystander Richard Johnson approached and warned Morisette to put the knife away and said that whatever he was thinking of doing was not worth it. Morisette turned and asked, "You want some of this?" and then walked toward Johnson. Johnson again told Morisette to put down the knife. Morisette pointed the knife at himself and said, "I want to die."

Around the same time, a car pulled out of a nearby parking garage. Morisette banged on the hood of the car, and he started swinging his knife around. Marquis then called 911. At that point, Biruk Haile was walking by while looking at his phone when Morisette cut Haile's arm. Before Haile realized what was happening, Haile dropped his phone. As he attempted to pick up his phone, he noticed blood on his hand and saw Morisette swing the knife at him again. Haile grabbed an orange traffic cone to block any further advances by Morisette.

Morisette then walked toward a nearby entrance of the Nordstrom building when security officer Gregory Grady came outside. Grady had heard someone yelling on the street, "I've been stabbed. Somebody call the police, I've been stabbed." Morisette lunged at Grady and took a swipe at him, but Grady moved

2

out of the way.

Morisette continued walking up the sidewalk. Terry Sheets, who was working as a Nordstrom valet attendant, stood on the sidewalk near the store entrance. He heard some commotion, and as he turned, Morisette stabbed him in the neck.

Morisette then walked across the street, stabbed the back of another person, Robert Desjarlais, and then walked away. As he walked past a delivery truck, he threw the knife inside. He then took off his clothes and sprinted toward the freeway before police made contact. Morisette immediately complied with police orders and was arrested.

The State charged Morisette with four counts: (1) assault in the first degree of Terry Sheets, (2) assault in the second degree of Robert Desjarlais, (3) assault in the second degree of Biruk Haile, and (4) assault in the second degree of Gregory Grady.

Before trial, at defense counsel's request, the court ordered an evaluation of Morisette to determine his competency to stand trial. Dr. Cynthia Mundt, a forensic psychologist, conducted the evaluation. She was unable to complete the interview because Morisette would speak very low, then eat pieces of paper, and then responded loudly in a manner that suggested he was attempting to speak in a foreign language and not respond to questions in English. Mundt reviewed his relevant clinical history, including his history of inpatient and

outpatient assessments and treatment dating back to at least 2009. This review included his most recent evaluation from December 2018. Mundt also reviewed King County Correctional Facility mental health records. Records revealed disruptive behavior such as throwing feces or his food tray, spitting, flooding, banging on doors, and not following directions. Mundt reported that at times, Morisette "informed jail staff that he would continue engaging in the above behaviors until his requests or demands were met, such as a desire to move to psychiatric housing."

Morisette had been previously diagnosed with unspecified schizophrenia spectrum and other "psychotic disorder," unspecified substance abuse disorder, personality disorder with antisocial traits, bipolar disorder, autism spectrum disorder, and possible ADHD. He also had a history of attempting to feign symptoms to manipulate housing in jail and to influence the outcome of forensic mental health evaluations. In 2018, forensic evaluator Dr. George Nelson concurred with clinical opinions offered by prior evaluators in general but concluded that Morisette's presentation was suggestive of efforts to exaggerate his symptoms and that he had the capacity to understand the proceedings and assist in his defense. Mundt reported that Morisette's presentation during her attempted interview was an attempt to do the same. Mundt reported,

> It is my opinion that Mr. Morisette did not present during my attempt
> to interview him with genuine symptoms of a mental illness. A
> review of recent collateral records from the jail suggests that he has

4

been compliant with medications for an extended period of time and has not presented with objective evidence of hallucinations, delusions, or bizarre or unusual beliefs. He has consistently presented with evidence of organized and goal-directed thought processes, as demonstrated by his interactions with jail staff and his written requests. Mr. Morisette has a history of interaction with the legal system and therefore has some familiarity with typical court proceedings. He has also been assessed on multiple prior occasions and has been opined on more than one occasion to have sufficient factual knowledge to demonstrate a capacity to understand his charges and proceedings.

Dr. Mundt's diagnostic impressions of Morisette were malingering; unspecified schizophrenia and other psychotic disorders, by history; substance use disorders (methamphetamine and ecstasy), by history; rule-out, unspecified personality disorder, with mixed traits, by history. She concluded there was currently insufficient evidence available to suggest that, due to symptoms of a mental illness, Morisette lacked the capacity to understand the nature of the proceedings against him or lacked the capacity to assist in his own defense. The trial court entered an order finding Morisette competent to stand trial.

Voir dire began on March 23, 2021. Morisette asked if he could dismiss himself if he had no say in which jurors would be showing up. The court responded that if he was making a knowing and thoughtful decision to not observe the proceedings, he has that right. The court took a recess so that he could speak with counsel about that decision. When trial resumed, a transport officer informed the court that he was not comfortable bringing Morisette back to court based on sanitary conditions. Later, his counsel testified through a

5

declaration that Morisette had put his head in the toilet. Trial concluded for the day, and jury selection continued the next day with Morisette present. Morisette's counsel explained that because of his client's psychotic disorders and Asperger's disorder, it would be helpful if the court could take additional scheduled breaks. The court granted that request.

On March 29, Morisette refused to be transported. The court signed an order allowing use of reasonable force, if necessary, to transport him. The transport officer stated that jail staff was able to transport him without using reasonable force but requested that he remain in restraints because of his "erratic behavior." Defense counsel objected. When the court inquired, the jail staff explained it was a concern of more "erratic decision-making today" than erratic behavior. Jail staff noted that Morisette was "very polite, but he was adamant that he was not going to court," but then they were able to convince him to go to court without using force.

During voir dire, Morisette interrupted the court saying he had the right to speak, told a juror "you do take things too far," discussed the abuse of the justice system, and told his attorney he was not helping his case "by any means." When a juror told the court they thought the case was a "slam dunk," Morisette started singing loudly, making it hard to hear. Morisette made a motion to represent himself for many reasons including that he had not been allowed to go to Western State Hospital, but the court denied the request.

6

When the State was in the middle of its opening statement, Morisette interrupted with "I don't think he has his facts straight." The court recessed and told Morisette that if he had another outburst, the court would have him removed from the courtroom or gagged. When trial resumed, he did not interrupt for the rest of the State's opening statement.

Morisette's courtroom behavior during a witness's testimony caused the court to have to take a recess. The court again warned Morisette that if he could not stop his outbursts, the court would have him removed.

On April 6, while Sheets testified about being stabbed in the neck, Morisette mimicked a stabbing motion with a ballpoint pen into his own neck. Morisette also clenched his hand around a pen and thrust his hand toward his counsel but stopped short of striking her. He made a similar motion with a closed fist shortly after. Additionally, at some point that morning, Morisette walked toward a jail officer and expressed that he wanted to leave but sat down at the direction of counsel. The parties were not aware if the jurors had seen these incidents because it was during witness testimony, and Morisette was not in the jurors' line of sight to the witness stand. Defense counsel requested a mistrial, and the court denied that request, reasoning that any irregularity was caused by Morisette.

On April 7, the court addressed whether Morisette's conduct raised security issues and a need for restraints. Morisette told the court that restraints

were not necessary and that he understood he was being recorded and in a movie—but whoever the actor was, Chris Morisette is not him. He stated,

> I'm not claiming to be him, nor do I have any identification on me or paperwork to match this name or any of the numbers on it, sir, that I'm redacted discovery short of even providing anything of a competent trial, and I – I am sorry about whoever comes in or whatever this stuff is, I do not claim to be involved, and that is all.

When Morisette interrupted the court's discussion regarding restraints, the court told Morisette not to make any more outbursts. The court once again warned Morisette that it could remove him. Morisette responded, "Then remove me." Defense asked for a recess to allow them to talk to Morisette outside the courtroom. The court recessed, and when it resumed, counsel returned without Morisette.

Defense counsel then requested another competency evaluation "in an abundance of caution." Counsel stated, "I think we were comfortable proceeding through trial, but I think the stress of trial has been overwhelming for him, and I think that's been the change that we've seen in the last 24 hours or so." The court denied the motion, stating,

> It has been my observation that most of Mr. Morisette's outbursts have been rational, at least within the realm of rationality as far as I can tell. Some of the things he said in court this morning were nonsensical – that's true – but I can't tell whether he's saying that as part of a disruption or whether he's truly having an episode of some sort that's beyond my competence to evaluate. What I do know is Mr. Morisette has been previously evaluated by those who are trained to evaluate such matters and he's been found competent and he has for the most part been able to participate in

8

this trial when he has chosen to do so although he has from time to time chosen not to participate and has frequently put his head down on the table at counsel table even when he's been present in court.

The court then asked counsel to comment on Morisette's lack of presence in the courtroom. Counsel responded, "I think he understands he has the right to be here and we're comfortable relaying to the Court that he's waiving that right." Counsel further told the court that Morisette was not explicitly made aware he had the option of observing the trial via video in another courtroom. The court directed counsel to make Morisette aware of this option, which counsel then did, and later conveyed that Morisette declined and asked to be moved back to jail. The court inquired if Morisette's counsel was satisfied that Morisette's decision to no longer be present in the courtroom were "knowing, intelligent, and voluntary," and counsel responded "yes." Counsel stated that he still had concerns about "the overall issue" as to the motion for evaluation. All that remained after Morisette waived his presence was closing arguments. When the jury reached its verdict, Morisette still waived his presence. The court asked defense counsel if she had consulted with her client regarding his attendance. Counsel answered that she had and that she believed "he's decided to not attend voluntarily and intelligently." The jury convicted Morisette on all counts.

On April 21, after trial concluded, defense counsel filed a motion requesting a competency evaluation. In the defense declaration supporting the motion, counsel listed the various times Morisette disrupted trial, but also

9

disruptive observations made after closing arguments. Counsel wrote that when she went to the jail after closing arguments to discuss the taking of the verdict, the jail staff informed her that Morisette had smeared feces in his cell and that counsel had to visit him at the cuff port of his cell. Counsel also wrote that she had met with her client two more times and that his appearance and demeanor had not noticeably changed.

The court granted the motion requesting a competency evaluation. Dr. Mundt completed the evaluation. She attempted twice to interview Morisette, but he refused to participate. Accordingly, she based her opinion on collateral information. At the recommendation of defense counsel, Mundt reviewed the April 7 audio recordings of the trial. Mundt also reviewed Morisette's jail mental health records from September 26, 2020 through April 28, 2021. Mundt explained,

> Since the time of my prior evaluation, Mr. Morisette has remained compliant with medication and has had frequent contact with and observation by jail mental health staff. There is no indication in records of any decreases in his functional capacities at any time during the last eight months or in recent history. He has increasingly presented in multiple contexts in recent history of increasingly bizarre and unpredictable behavior. This behavior is not consistent with symptoms of psychosis and as noted above is better attributed to an attempt to feign symptoms of psychosis. Mr. Morisette mentioned to jail mental health staff on multiple occasions that he needed documentation or information to support his belief that he was not competent to stand trial and sought to recruit their support in achieving this goal. His behavior in this regard, as well as his behavior as described in records related to episodes of aggression, housing manipulation, medication seeking, and

10

attention seeking are all suggestive of logical, linear, goal-directed, and volitional behavior.

Mundt opined that there was insufficient evidence to suggest that, due to symptoms of mental illness, Morisette was unable to understand the proceedings or assist counsel. The court entered an order finding Morisette competent. He was sentenced on all four counts and now appeals.

DISCUSSION

Competency Evaluation

Morisette contends that the court should have ordered a competency evaluation during trial.[1] We disagree.

The due process clause of the Fourteenth Amendment to the United States Constitution guarantees an accused the fundamental right not to stand trial if he is legally incompetent. State v. Ortiz-Abrego, 187 Wn.2d 394, 402-03, 387 P.3d 638 (2017). Further, under Washington law, "No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." RCW 10.77.050. A defendant is incompetent when he or she "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(16).

---

[1] Morisette filed a statement of additional grounds that also raises this same issue.

11

No. 82805-3-I/12

A defendant suffering delusions does not necessarily prevent him from being competent to understand the proceedings and assist with his defense. See State v. Benn, 120 Wn.2d 631, 661-62, 845 P.2d 289 (1993); see also State v. Hahn, 106 Wn.2d 885, 887-88, 726 P.2d 25 (1986). A defendant who has the ability to assist with his defense does not mean he must be able to suggest or choose trial strategy. Benn, 120 Wn.2d at 662; State v. Ortiz, 104 Wn.2d 479, 483, 706 P.2d 1069 (1985).

RCW 10.77.060 provides that if a court finds there is reason to doubt a defendant's competency, the court must have the defendant evaluated by a qualified professional who will report on the defendant's mental condition. RCW 10.77.060(1)(a). The trial court's determination of competence is a matter within its discretion, reversible only upon a showing of abuse of discretion. Ortiz, 104 Wn.2d at 482. An abuse of discretion occurs only when no reasonable judge would have reached the same conclusion. State v. Hager, 171 Wn.2d 151, 156, 248 P.3d 512 (2011).

After a competency determination is made, the court need not revisit competency unless new information presented alters the status quo ante. State v. Ortiz, 119 Wn.2d 294, 301, 831 P.2d 1060 (1992). The factors a trial judge may consider in deciding whether or not to order a competency evaluation include the "defendant's appearance, demeanor, conduct, personal and family history, past behavior, medical and psychiatric reports and the statements of

12

counsel." In re Fleming, 142 Wn.2d 853, 863, 16 P.3d 610 (2001) (quoting State v. Dodd, 70 Wn.2d 513, 514, 424 P.2d 302 (1967)).

Morisette argues that based on his nonsensical outburst about being in a movie, he was no longer capable of making necessary decisions at trial, such as whether he would be present and able to testify. However, at trial, defense counsel only made a motion to establish competency out of an "abundance of caution" based on Morisette's behavior on April 6 and 7. The court was aware of the previous competency report indicating that the diagnostic impression was malingering. Also, indications of delusions do not necessarily prevent someone from being competent to understand the proceedings and assist with his defense. And disruptive behavior does not necessarily give rise to a doubt as to whether someone understands the proceedings and can assist in a defense. As the trial court noted, with the exception to his reference to a movie, Morisette's outbursts were in relation to what was happening in court. After the court would threaten him with being gagged or removed, he responded by either complying, or in the last instance telling the court that he wanted to be removed. These responses did not necessarily create a doubt as to competency.

Additionally, after defense counsel made his motion for a competency evaluation, he spoke with Morisette regarding whether he waived his right to be present in the courtroom. Defense counsel relayed to the court that Morisette had knowingly, intelligently, and voluntarily waived his right, therefore indicating

he was competent at the exact time that counsel had made a motion for a competency evaluation. Defense counsel again represented to the court at the taking of the verdict that Morisette waived his presence voluntarily and intelligently.

Finally, the competency evaluation conducted after trial considered Morisette's behavior during trial both in the courtroom on April 7 and his behavior in the jail between September 26, 2020 and April 28, 2021. The evaluator, Mundt, again found Morisette to be malingering and that "[t]here is no indication in records of any decreases in his functional capacities at any time during the last eight months or in recent history."

The court did not abuse its discretion when it did not order a competency evaluation during trial. It had no reason to believe that circumstances had changed from the first competency report that attributed the conduct to malingering.

Ineffective Assistance of Counsel

Morisette next contends that he had ineffective assistance of counsel because his attorneys did not pursue a voluntary intoxication defense based on his consumption of methamphetamine. We disagree.

"To prevail on a claim of ineffective assistance of counsel, [the defendant] must establish both deficient performance and prejudice." State v. Jones, 183 Wn.2d 327, 330, 352 P.3d 776 (2015) (citing Strickland v. Washington, 466 U.S.

668, 339, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

"Deficient performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.'" State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).  We are highly deferential to the performance of counsel in evaluating the reasonableness of their actions.  State v. Crawford, 159 Wn.2d 86, 98, 147 P.3d 1288 (2006).  "There is a strong presumption that trial counsel's representation was adequate, and exceptional deference must be given when evaluating counsel's strategic decisions."  State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

Deficient performance prejudices a defendant when a "substantial" likelihood of a different outcome exists; it is not enough for a different outcome to be merely "conceivable."  In re Pers. Restraint of Lui, 188 Wn.2d 525, 538-39, 397 P.3d 90 (2017).  If a defendant fails to satisfy showing deficient performance or prejudice, the inquiry ends.  State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

Morisette argues it was deficient for his counsel not to present evidence or request an instruction for voluntary intoxication.  RCW 9A.16.090 provides the following regarding a voluntary intoxication defense:

> No act committed by a person while in a state of voluntary
> intoxication shall be deemed less criminal by reason of his or her
> condition, but whenever the actual existence of any particular

> mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

A defendant is entitled to a voluntary intoxication instruction when (1) the crime charged includes a mental state, (2) there is substantial evidence of consumption of the drugs, and (3) there is evidence that the drugs affected the defendant's ability to form the requisite intent or mental state. See State v. Kruger, 116 Wn. App. 685, 691, 67 P.3d 1147 (2003). The evidence "must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." Id. at 691-92 (quoting State v. Gabryschak, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996)).

Morisette argues that his defense counsel should have elicited evidence that was at its disposal so that Morisette would have been entitled to this instruction. First, Morisette argues that his statement to an officer, indicating he had taken methamphetamine earlier that morning and could not remember anything since four days earlier, should have been introduced. Id. However, Morisette could have only introduced this evidence if he testified at trial, which he elected not to do. Whether to testify or not testify at trial is a decision that is held by the defendant. State v. Thomas, 128 Wn.2d 553, 558, 910 P.2d 475 (1996).

Second, Morisette asserts that defense counsel should have sought to introduce the results of a urine drug screen done the day of the incident at the

16

jail, which detected the presence of amphetamine, methamphetamine and cannabis. However, contrary to Morisette's assertion, the mere presence of drugs in his system does not establish when the drugs were consumed or what its affect would have been. See State v. Lewis, 141 Wn. App. 367, 389, 166 P.3d 786 (2007) (observing that methamphetamine has a wide range of effects on different individuals).

Effective assistance of counsel includes a request for pertinent instructions which the evidence supports. State v. Finley, 97 Wn. App. 129, 134, 982 P.2d 681 (1999). There was no evidence in the instant case that would have supported a voluntary intoxication instruction. Counsel was not deficient for not requesting an instruction he could not support with evidence. Because Morisette cannot show deficiency, the inquiry ends.

<u>To-Convict Instruction</u>

Morisette lastly contends that the conviction on Count 4 must be vacated because the to-convict instruction as to that count included an alternative means of committing assault in the second degree, which was not supported by the evidence. The State concedes that this count should be vacated, and we agree.

Under the Washington Constitution, criminal defendants have the right to a unanimous verdict. WASH. CONST. art. I, § 21. If there is insufficient evidence to support a conviction of a crime based on one of multiple alternative means set out in the to-convict instruction, that conviction must be reversed unless it has

No. 82805-3-I/18

been established that the jury unanimously concluded that the defendant was guilty based on the alternative means that was supported by the evidence. State v. Woodlyn, 188 Wn.2d 157, 165, 392 P.3d 1062 (2017).

In Count 4, the State charged Morisette with two alternative means of committing assault against Grady—with a deadly weapon and/or by recklessly inflicting substantial bodily harm. The jury was instructed:

> To convict the defendant of the crime of assault in the second degree, as charged in Count 4, each of the following two elements of the crime must be proved beyond a reasonable doubt:
>
> > (1) That on or about July 9, 2019, the defendant:
> >
> > > (a) intentionally assaulted Gregory Grady and thereby recklessly inflicted substantial bodily harm; or
> > >
> > > (b) assaulted Gregory Grady with a deadly weapon;
> > and
> >
> > (2) That this act occurred in the State of Washington.
>
> If you find from the evidence that element (2) and either alternative element (I)(a) or (I)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (I )(a) or (I)(b) has been proved beyond a reasonable doubt , as long as each juror finds that either (I)(a) or (I)(b) has been proved beyond a reasonable doubt.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to either element (1) or (2), then it will be your duty to return a verdict of not guilty as to Count 4.

(Emphasis added.)

Here, there was no evidence that Grady was harmed by Morisette

18

because Grady testified that Morisette attempted to stab Grady but missed. Therefore, there was no evidence supporting the alternative means involving infliction of harm. Further, the jury was not asked to indicate whether it was unanimous as to either means. Accordingly, we reverse Morisette's conviction on Count 4.

## CONCLUSION

We affirm the convictions on Counts 1, 2, and 3, but we reverse the conviction on Count 4 and remand for resentencing.

_Coburn, J._

WE CONCUR:

_Hazelrigg, J._      _Mann, J._